UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

DAVID L. HUNT,                      )
                                    )
              Plaintiff,            )
                                    )
        v.                          )        No. 2:09 CV 47 DDN
                                    )
                                    )
MICHAEL J. ASTRUE,                  )
Commissioner of Social Security,    )
                                    )
              Defendant.            )

**MEMORANDUM**

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff David L. Hunt for disability insurance benefits under Title II of the Social Security Act, and supplemental security income under Title XVI, 42 U.S.C. § 401, <u>et seq.</u> The parties have agreed to the exercise of plenary authority by the undersigned United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c). (Doc. 11.) For the reasons set forth below, the decision of the Commissioner is affirmed.

**I. BACKGROUND**

Plaintiff David Lee Hunt was born on June 4, 1970. (Tr. 40.) He is 6'0" tall, with a weight that has ranged from 235 pounds to 317 pounds. (Tr. 27, 209.) He completed the 10th grade, but was in special education classes. (Tr. 25.) He is divorced, and was living with a friend. (Tr. 25, 75.) He last worked as a bouncer for a bar. (Tr. 174.)

On November 8, 2006, Hunt applied for disability insurance benefits and supplemental security income, alleging he became disabled on August 26, 1994, due to lower back pain, neck pain, knee pain, carpal tunnel

syndrome, and depression.[1] (Tr. 21, 40-41.)  He received a notice of disapproved claims on January 4, 2007.  (Tr. 43-47.)  After a hearing on January 13, 2009, the ALJ denied benefits on April 3, 2009. (Tr. 7-18, 19-39.)  On July 10, 2009, the Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-3.)

## II.  ADMINISTRATIVE RECORD

Hunt earned income from 1987 until 2004.  In 1988, 1989, 1990, 1995, 1999, and 2000, he earned less than $1,000.  In 2001, he earned $3,399.34; in 2002, he earned $9,216.38 (his highest earnings for any period); in 2003, he earned $3,687.92; and in 2004, he earned $1,632.76. (Tr. 88.)

In a work history report, Hunt listed the different jobs he held between 1993 and 2004.  From 1993 to 1994, he worked in construction. From 1996 to 1997, he worked as a deep fry cook, a grocery bagger, and a janitor.  From 1997 to 1998, he worked in a concrete business, in a furniture warehouse, and for a package delivery service.  From 1998 to 1999, he worked in a furniture warehouse and as a cook and dishwasher in a restaurant.  From 2001 to 2002, he worked for a freight delivery service, as a cook and dishwasher in restaurants, as a grain bagger, and for a city, maintaining lakes and lawns.  From 2002 to 2003, he worked as a bouncer, for construction companies cutting rebar, and for a city, maintaining lakes and lawns.  From 2003 to 2004, he worked as a bouncer for a bar.  In almost every one of these jobs, Hunt was on his feet for several hours at a time.  These jobs also required Hunt to frequently lift between twenty-five and fifty pounds.  (Tr. 116-43, 155-70, 174.)

In a disability report, Hunt described why he was unable to work. He suffered from lower back pain, carpal tunnel, neck pain, knee pain, and chronic depression.  The pain made it difficult for Hunt to pick up heavy objects, and the depression made it hard to be around other people.  The pain in his hands and neck also made it hard for Hunt to

_____

[1]At the hearing, Hunt amended his onset date to March 31, 2007. (Tr. 24.)

perform daily activities, like mowing the lawn, washing dishes, going to the bathroom, and getting dressed. He took Tylenol because he could not afford other medication. Hunt stopped working on November 14, 2003, because of the pain. At the end of the form, Hunt noted that he had been unable to see a doctor in the last twelve years because his jobs did not provide benefits, and because he could not otherwise afford it. Hunt applied for jobs, but did not get them. He believed employers found his back problems a liability, noting that those who applied for the same jobs after he had done so, might get the job. Hunt indicated that he had applied for benefits because he needed to do something to help his family. "If I can't get a job on my own then I need to do something to take care of my family so here I am and here I will stay till I get on [social security.] [E]ven if it takes me the next 10 years I'll keep [coming] back till you [people] give me [social security] or something so plan on seeing me for a while." (Tr. 144-53.)

On August 27, 2001, Hunt saw Alan Bilyeu, M.D., for depression. He was crying, nervous, and stressed, but was not suicidal. A physical examination showed Hunt was overweight, but that his nose, throat, and lungs were clear. Dr. Bilyeu diagnosed Hunt with severe depression, and prescribed Prozac and Ambien.[2] (Tr. 209.)

On September 19, 2001, Hunt saw Dr. Bilyeu, complaining of pain in his right arm and hand, possibly from working at the grain company. A physical examination showed tenderness over the median nerve of the right hand, and pain with movement. He had full range of motion in the elbow and shoulder. Dr. Bilyeu diagnosed Hunt with De Quervain's tenosynovitis and right extensor pollicis brevis, with possible carpal

---

[2]Ambien is used to treat insomnia. Prozac is used to treat depression, anxiety disorders, and obsessive-compulsive disorder. WebMD, http://www.webmd.com/drugs (last visited May 19, 2010).

tunnel.[3]  Dr. Bilyeu put Hunt in a wrist split, and excused him from work for the next five days.  (Tr. 209.)

On March 27, 2002, Hunt saw Dr. Bilyeu, complaining of congestion, chills, and sweats.  He was still smoking, and Dr. Bilyeu encouraged him to quit.  He diagnosed Hunt with bronchitis, and prescribed Keflex and Robitussin.[4]  (Tr. 209.)

On November 21, 2006, Hunt completed a function report.  In a typical day, Hunt fed and changed his daughter.  After that, he loaded the dishwasher, vacuumed the front room, and swept the kitchen floor. He spent the rest of the day caring for his daughter.  He watched television until about 2:00 or 4:00 in the morning, and then went to bed.  He prepared meals once a year, and it took four or five hours. He did not prepare his own meals because standing too long hurt his back.  Hunt only mowed the lawn about three times during the summer, and it took him about forty-five minutes.  Hunt was able to drive, and could go out alone.  Because of knee pain, he could only walk about thirty yards before needing to rest for five minutes.  He was constantly stressed, and did not handle changes well.  Even though he could do some housework, Hunt noted that it was not as much as he wished he could do. And the housework that he was able to do placed a lot of stress on his hands and back, to the point where he had to lie down for several hours before doing any more physical activity.  (Tr. 184-91.)

On November 21, 2006, Hunt's girlfriend, Malinda Wilson, completed a third-party function report.  She had known Hunt for over nine years, and spent most of the day with him, hanging out and watching television.

[3]De Quervain's tenosynovitis is a condition brought on by irritation or inflammation of the wrist tendons at the base of the thumb.  The inflammation causes the compartment around the tendon to swell and enlarge, making thumb and wrist movement painful.  American Society for Surgery of the Hand, http://www.assh.org/Public/HandConditions/Pages/ deQuervainsTendonitis.aspx (last visited May 19, 2010).

[4]Keflex is an antibiotic used to treat a variety of infections. Robitussin is used to temporarily treat coughing and chest congestion symptoms caused by the common cold, flu, or other breathing illnesses (like sinusitis or bronchitis).  WebMD, http://www.webmd.com/drugs (last visited May 19, 2010).

In a typical day, Hunt spent most of the day caring for their two-year old child. He made her breakfast and lunch, and changed her diaper. Wilson noted that Hunt had trouble gripping objects and wiping himself. Hunt was able to make himself sandwiches, every day, in about ten minutes. He was also able to do the laundry, load the dishwasher, drive, and go out by himself. He shopped once or twice a year, for between twenty and thirty minutes. Hunt had trouble getting along with his mother and sister. He could not lift more than thirty pounds, and could not walk more than fifty feet before needing to rest for twenty to thirty minutes. He had no problem paying attention or following instructions. Hunt had quit a job because he could not get along with the lead person, and tended to throw things and threaten people when stressed. He was unable to bend his knees for long periods of time, and his knees would give out if he was squatting, kneeling, or bending for any extended period. (Tr. 175-83.)

In a disability report, Hunt noted suffering from back pain for the last twelve years, and suffering from carpal tunnel for the last six. He had trouble wiping himself and picking up his two-year old daughter. He hoped to get approved for Medicaid, so that he could get the help he needed. (Tr. 195-200.)

On December 29, 2006, Hunt saw Eddie Runde, M.D., at Occupational and Environmental Physicians. Hunt traced his back history to an accident on August 26, 1994, when he was working construction. Hunt was taken to the emergency room that day. X-rays showed he had sprained his back, but he did not receive any other treatment for his back. A week later, a "work-comp doctor" requested more x-rays and an MRI. The doctor told Hunt the x-rays and MRI were normal, but Hunt was skeptical. He began physical therapy, but the therapy aggravated his pain, and he refused any more therapy. Six months later, the Carl Clinic in Illinois also told Hunt there was nothing wrong with his back. Hunt continued to complain of back pain, for which nothing helped. In 2000 or 2001, Hunt said he injured his left hand while stacking bags of grain. His doctor diagnosed him with carpal tunnel. When he switched jobs and hurt his right hand, his employer declined to authorize treatment. Hunt did not have the money to see a doctor, so he took Tylenol. (Tr. 212-13.)

A physical examination showed Hunt was able to dress and undress without help, and was able to get on and off the table without help. Dr. Runde found his cervical spine was full, and showed normal range of motion without any complaints. There was no tenderness, erythema, edema, or ecchymosis.[5] Testing of the upper extremities was normal (5/5) in all the major muscle groups of each hand. Tinel's sign was negative at the carpal tunnels, and sensation was normal to light touch.[6] Hunt was able to oppose all fingers, make a fist, and perform fine finger movements. He had no complaints during grip testing, and grip testing was normal, though the results suggested poor effort. He had no erythema, edema, or ecchymosis after grip testing. The lumbar spine showed no tenderness on palpation. The lower extremities were normal, and Hunt had a normal gait, with no foot drop. He had generalized tenderness in each knee, but no effusion, erythema, edema, or ecchymosis. He had full range of motion in each knee, and Drawers's test and Lachman's test were negative.[7] A mental status examination showed Hunt was alert and fully oriented, and in no acute distress. His affect was full and appropriate. (Tr. 213-15.)

Dr. Runde diagnosed Hunt with chronic lower back pain, degenerative joint disease of the knees, and obesity. Dr. Runde noted that Hunt's subjective opinions were greater than the objective findings. In particular, Dr. Runde noted that the complaints of carpal tunnel syndrome were "without stereotypical symptoms or objective findings to support this diagnosis." Dr. Runde restricted Hunt to occasionally

---

[5]Erythema is inflammatory redness of the skin. Stedman's Medical Dictionary, 533 (25th ed., Williams & Wilkins 1990). Edema is an accumulation of watery fluid in cells, tissues, or cavities. Id., 489. Ecchymosis refers to a purplish patch caused by blood passing out of the blood vessels and into the skin. Id., 484, 553.

[6]Tinel's sign is a sensation of tingling, or of "pins and needles," felt in the distal extremity of a limb, when percussion is made over the site of an injured nerve. Stedman's Medical Dictionary, 1422.

[7]Drawer's test and Lachman's test are used to test the integrity of the anterior crucial ligament. Sports Medicine Institute, http://www.sportsdoc.umn.edu/Clinical_Folder/Knee_Folder/Knee_Exam/lachmans.htm, and http://www.sportsdoc.umn.edu/Clinical_Folder/Knee_Folder/Knee_Exam/anterior%20drawer.htm (last visited May 19, 2010).

lifting up to fifty pounds, frequently lifting up to twenty-five pounds, standing and walking for six hours in an eight-hour workday, sitting for six hours in an eight-hour workday, and occasionally climbing, kneeling, and crouching. (Tr. 215.)

On April 17, 2007, Hunt saw Christopher Hartigan, APRN, BC, for the first time. Hartigan noted that Hunt had a high score of depression. A general examination showed Hunt was in no acute distress. He was alert and oriented. His neck was supple, his lungs were clear, and his heart was regular. His lower back showed some mild diffuse tenderness. He was negative for Tinel's sign, but positive for Phalen's.[8] Muscle strength was equal and strong throughout, with sensation intact to light touch. Hartigan diagnosed Hunt with lower back pain, GERD, insomnia, depression, and possibly episodes of sleep apnea. (Tr. 237-38.) He planned for Hunt to take Zantac, Remeron, Neurontin, Flexeril, Tramadol, and Meloxicam, and recommended a future sleep study and MRI.[9] (Tr. 237-38.)

On May 3, 2007, Jamey Wright, M.D., reviewed an x-ray of Hunt's spine. Dr. Wright found there was spondylolysis and grade 1 spondylolisthesis at L5, but otherwise, the vertebral body heights and alignment were maintained at the other levels.[10] (Tr. 228.)

On January 28, 2008, Christopher Bauman, M.D., reviewed an x-ray of Hunt's lumbar spine. The x-ray revealed mild edema at L5, likely due

---

[8]Phalen's sign is used to test for carpal tunnel syndrome. WebMD, http://www.webmd.com/pain-management/carpal-tunnel/physical-exam-for-carpal-tunnel-syndrome (last visited May 19, 2010).

[9]Zantac is used to treat stomach ulcers. Remeron is used to treat depression. Neurontin is used to control seizures and to relieve nerve pain in adults. Flexeril is a muscle relaxant and is used with rest and physical therapy to decrease muscle pain and spasms. Tramadol is used to relieve moderate pain. Meloxicam is used to treat arthritis by reducing pain, swelling, and stiffness of the joints. WebMD, http://www.webmd.com/drugs (last visited May 19, 2010).

[10]Spondylolisthesis is the forward movement of the body of one of the lower lumbar vertebrae on the vertebra below it, or upon the sacrum. Stedman's Medical Dictionary, 1456. Spondylolysis is degeneration of the articulating, or joining, part of a vertebra. Id.

to degenerative disk disease at L5-S1.[11]  There was disk dessication from L3 to S1, and slight subluxation of L5 on S1.[12]  There was a spondylolysis at L5.  There was a broad-based disk bulge at L3-4, with an annular tear, but no significant canal stenosis or neural foraminal narrowing.[13]  There was bilateral facet arthropathy with some hypertrophy.[14]  There was broad-based disk protrusion at L4-5, with an associated annular tear, and mild facet arthropathy.  There was mild neural foraminal narrowing from the facet arthropathy, but this did not appear to significantly compress the nerve roots.  There was another disk bulge at L5-S1 with osteophyte formation and grade 1

---

[11]Degenerative disk disease refers to the normal changes that occur in the spinal disks as a result of aging.  These changes can produce neck and back pain, as well as osteoarthritis, herniated disks, and spinal stenosis (the narrowing of the spinal canal).  WebMD, http://www.webmd.com/back-pain/tc/degenerative-disc-disease-topic-overview (last visited May 19, 2010).

[12]Disk dessication is the drying out of the intervertebral disks. Stedman's Medical Dictionary, 422.  Subluxation is an incomplete dislocation.  The normal relationship is altered, but there is still some contact between joint surfaces.  Id., 1494.

[13]An annual tear is a lesion, with internal disruption.  It is characterized by a leaking disc, which permits the liquid material that is normally restricted to the center of the disc to come into contact with the innervated tissue.  Wheeless's Textbook of Orthopaedics, http://www.wheelessonline.com/ortho/annular_tear (last visited May 19, 2010).  Stenosis is the narrowing or constriction of any canal. Stedman's Medical Dictionary, 1473.
    The neural foramen is the space through which nerve roots exit the spinal canal to form peripheral nerves.  Each foramen is a bony canal formed by the pedicles of two adjacent vertebrae.  Medcyclopaedia, http://www.medcyclopaedia.com/library/topics/volume_vi_1/n/neural_foramen.aspx?s=neural+foramen&mode=1&syn=&scope= (last visited May 19, 2010).

[14]The facet joints are small stabilizing joints located between and behind adjacent vertebrae.  See Stedman's Medical Dictionary, 556. Facet arthropathy refers to the pain and discomfort caused by the degeneration of the facet joints.  Back.com, http://www.back.com/causes-mechanical- facet.html (last visited May 19, 2010).  Hypertrophy is the general increase in bulk of a part or organ, not due to tumor formation.  Stedman's Medical Dictionary, 746.

anterolisthesis, but no significant central canal stenosis or neural foraminal narrowing.[15]  (Tr. 225-26.)

On January 31, 2008, Hunt saw Nurse Hartigan, for a follow-up on his lower back pain, GERD, sleep apnea, chest pain, obesity, blood pressure, and depression.  His GERD was stable, but his back pain was unremitting.  An examination showed Hunt was alert and oriented, and in no acute distress.  His lungs were clear, and his abdomen was soft and nontender.  Sensation was intact to light touch, and his muscle strength was 4 to 5+, and symmetrical.  Hartigan diagnosed Hunt with lumbar disk disease, lower back pain, being overweight, depression, insomnia, and sleep apnea.  He prescribed Wellbutrin because Hunt's depressive symptoms and energy levels were not improving.[16]  (Tr. 244.)

On March 3, 2008, Hunt received a polysomnogram report.  Iqbal Khan, M.D., diagnosed Hunt with a mild to moderate obstructive sleep apnea, that appeared to be linked with thumb-sucking behavior.  Dr. Khan noted that a more severe sleep apnea syndrome could be a possibility.  Dr. Khan suggested a consultation to alter his thumb-sucking behavior, sleep hygiene, and weight reduction.  (Tr. 227.)

On April 3, 2008, Hunt saw Usiakimi Igbaseimokumo, M.D., complaining of back pain and hand pain, each 8/10.  Dr. Igbaseimokumo noted that Hunt had a history of back pain, with associated paresthesia at L5.[17]  A physical examination showed Hunt was healthy, but overweight. His cranial nerves were intact, and the power in his extremities was normal.  His reflexes were symmetrical.  An MRI showed degenerative

---

[15]Anterolisthesis refers to a situation where the upper vertebral body is positioned abnormally compared to the vertebral body below it. In particular, the upper vertebral body slips forward on the one below. The amount of slippage is graded on a scale from 1 to 4.  Grade 1 is mild (20% slippage), while grade 4 is severe (100% slippage).  Cedars-Sinai, http://www.csmc.edu/Patients/Health-Conditions/Anterolisthesis.aspx (last visited May 19, 2010).

[16]Wellbutrin is an antidepressant used to treat depression and mood disorders.  WebMD, http://www.webmd.com/drugs (last visited May 19, 2010).

[17]Paresthesia is an abnormal sensation, such as burning, pricking, or tingling.  Stedman's Medical Dictionary, 1140.

disks at L3-4, L4-5, and L5-S1, but there was no focal compression of the nerve roots or thecal sac, no significant joint narrowing, and no fractures or bone destruction. There was spondylolisthesis with mild subluxation at L5-S1. Dr. Igbaseimokumo diagnosed Hunt with lower back pain and bilateral hand pain, but noted that he would treat him conservatively. (Tr. 230-34.)

On June 19, 2008, Kraig J. Lage, M.D., reviewed an MRI of Hunt's lumbar spine. The MRI revealed mild foraminal stenosis and spondolysis with grade 1 spondylolisthesis at L5, and mild degenerative joint disease and disk bulging at L3-L4 and L4-5. The disk bulging caused borderline canal stenosis and mild foraminal stenosis. (Tr. 235-36.)

On September 2, 2008, Hunt saw Hartigan for a follow-up on his sleep apnea, lower back pain, depression, and GERD. He was doing well, and had been losing weight on the Atkins plan. He still had significant fatigue and back pain, but reported that he was dealing with it. An examination showed Hunt was alert and oriented, and in no acute distress. His neck was supple, and his lungs were clear. He had diffuse lower back pain. Hartigan diagnosed Hunt with lower back pain, GERD, thumb sucking, depression, obstructive sleep apnea, and hyperlipidemia. He prescribed Trazodone, Colace, and Robaxin.[18] (Tr. 248.)

On November 12, 2008, Hunt saw Nurse Hartigan. A musculoskeletal examination showed there were no diffuse problems or tenderness. Straight leg raising was negative, and the remainder of the lower extremity neurological exam was unremarkable. Hartigan diagnosed Hunt with lower back pain, stable GERD, sleep apnea, hyperlipidemia, depression, and obesity that was getting worse. He presribed Ultram, Remeron, and Zanaflex.[19] (Tr. 268.)

---

[18]Trazodone is used to treat depression. Colace is used to treat occasional constipation. Robaxin is a muscle relaxant, and is used to decrease muscle pain and spasms associated with strains, sprains, or other muscle injuries. WebMD, http://www.webmd.com/drugs (last visited May 19, 2010).

[19]Ultram is used to relieve moderate pain. Zanaflex is used to treat muscle tightness and cramping (spasm) caused by conditions such (continued...)

On January 14, 2009, Hunt saw Hartigan.  A physical examination showed Hunt was well-nourished and well-developed, and in no apparent distress.  His lungs were clear, and his tongue and throat appeared normal.  His back showed tenderness and paravertebral muscle spasm, but had normal rotation.  A psychiatric examination showed Hunt had a normal affect, was not agitated or anxious, and had no suicidal ideation. (Tr. 282-83.)

That same day, Hartigan completed a medical assessment of Hunt's mental ability to do work-related activities.  Hartigan found Hunt had a fair ability to follow work rules, relate to co-workers, use judgment, function independently, maintain attention and concentration, maintain personal appearance, and understand, remember, and carry out simple job instructions.  He found Hunt had poor or no ability to deal with the public, interact with a supervisor, deal with work stress, and understand, remember, and carry out complex job instructions.  He found Hunt had between a fair and poor ability to behave in an emotionally stable manner and relate predictably in social situations.  Hunt based these conclusions on his diagnosis of moderate-severe depression. (Tr. 284-85.)

**Testimony at the Hearing**

On January 13, 2009, Hunt testified before the ALJ.  During the hearing, Hunt amended his onset date to March 31, 2007.  Hunt had completed the 10th grade while he was in school, and had been taking classes to receive a degree, but had to stop because of financial reasons.  Hunt had previously tried to pass the G.E.D., but had failed it nine times.  He was able to read and write, but his carpal tunnel syndrome prevented him from writing for more than ten or twelve minutes.

---

[19](...continued)
as multiple sclerosis or spinal injury.  WebMD, http://www.webmd.com/drugs (last visited May 19, 2010).

He weighed 317 pounds, and his doctors had advised him to lose weight, while prescribing Lipitor.[20]  (Tr. 19-28.)

Hunt believed he was unable to work because he could not sit or stand for very long.  His back gave him constant pain, ever since he had been involved in an accident in 1994.  Without medication, he rated the pain as 10/10; with medication, he rated the pain as 6/10 or 7/10.  Hunt believed employers were reluctant to hire him because they viewed his back pain as a liability.  Walking, running, and standing aggravated the pain.  Hunt could only stand for about ten or twenty minutes before he needed to lie down or sit down.  Chris Hardigan limited him to lifting three pounds.  Hunt was only receiving medication for his back problems.  Back surgery was not yet an option.  (Tr. 28-31.)

Hunt's back pain made concentrating difficult.  He also had problems bending over to clean dishes, vacuum, and perform other housework.  He estimated that he had to lie down ten to twelve times a day.  His back pain prevented him from sleeping, and gave him sleep apnea.  Hunt used to work in construction, but he could no longer hammer nails because of his carpal tunnel.  He was receiving medication for his carpal tunnel syndrome, but nothing else.  Hardigan treated Hunt for depression, and prescribed Neurontin.  Hunt was depressed because he felt he could not help around the house, pay bills, or afford to do anything.  He did not like being around crowds, and had anger issues. Hunt was able to drive, and had driven from his home in Moberly to the hearing in Columbia, but endured a lot of pain.  He usually tried to let a friend drive.  (Tr. 31-34.)

Hunt had mostly worked in construction, but had worked other jobs, like dishwashing, when construction work was unavailable.  Hunt had not worked any jobs that did not involve standing and heavy work.  Hunt was unable to afford carpal tunnel surgery, and Medicaid would not cover it. His back specialist did not believe fusion was a possibility until Hunt was in his 60s.  Hunt estimated that he could walk half a block, before he needed to sit down and rest, because of shooting pain.  He did not think he could lift more than three pounds.  If Hunt ever threw his back

--------

[20]Lipitor  is  used  to  lower  cholesterol.  WebMD, http://www.webmd.com/drugs (last visited May 19, 2010).

out, he needed to rest with a heating pad for three or four days.  (Tr. 34-39.)

### III.  DECISION OF THE ALJ

The ALJ followed the five-step procedure in reaching a decision. At Step One, the ALJ determined that Hunt had not engaged in substantial gainful activity since March 31, 2007, the alleged onset date.  At Step Two, the ALJ found Hunt suffered from obesity and degenerative disk disease, and that these impairments were severe.  The ALJ also found that Hunt suffered from GERD, sleep apnea, depression, and carpal tunnel syndrome, but concluded that these impairments did not limit Hunt's ability to perform basic work activities, and were not severe.  In concluding that Hunt's mental impairments were non-severe, the ALJ found Hunt had mild limitations in his (1) daily living activities; (2) social functioning; and (3) ability to maintain concentration, persistence, and pace.  The ALJ also determined that Hunt had not suffered any episodes of decompensation.  At Step Three, the ALJ found Hunt's impairments did not meet a listing limitation.  (Tr. 10-13.)

At Step Four, the ALJ found Hunt had the residual functional capacity (RFC) to perform the full range of light work.  In particular, the ALJ found Hunt could occasionally lift and carry twenty pounds, frequently lift and carry ten pounds, sit for six hours in an eight-hour workday, and stand/walk for six hours in an eight-hour workday.  The ALJ also found Hunt could push, pull, stoop, and crouch, and grasp, hold, and turn objects with his arms and hands.  In reaching this conclusion, the ALJ considered the medical evidence, the opinion evidence, and Hunt's obesity.  The ALJ referred to examinations by Dr. Runde and Dr. Carmignani with approval.  On the other hand, the ALJ discounted the opinions by Nurse Hartigan.  In doing so, the ALJ noted that Hartigan was not an acceptable medical source, that he relied on Hunt's own subjective testimony in reaching his conclusions, and that his conclusions were not always consistent with the medical evidence. (Tr. 13-16.)

The ALJ found Hunt's statements concerning the intensity, persistence, and limiting effects of his impairments to not be

completely credible. Dr. Runde believed Hunt was exaggerating his symptoms. In addition, Hunt had a limited medical history, and had never received surgery, physical therapy, or chiropractic treatment for his impairments. There was no evidence of recent emergency room visits, hospitalizations, or pain injections. There were no recent psychiatric hospitalizations, and no regular treatment by a psychologist or other mental health professional. Hunt's limited activities could not be objectively verified, and were inconsistent with the medical evidence – particularly the need to lie down repeatedly. Finally, his work history raised concerns about his desire and motivation to work. (Tr. 16-17.)

At Step Four, the ALJ found Hunt could not perform his past work. At Step Five, the ALJ found Hunt had the RFC to perform the full range of light work. Looking to the Medical-Vocational Guidelines, the ALJ concluded that Hunt was not disabled within the meaning of the Social Security Act. (Tr. 17-18.)

## IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and is supported by substantial evidence in the record as a whole. <u>Pate-Fires v. Astrue</u>, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." <u>Id.</u> In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. <u>Id.</u> As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. <u>See</u> <u>Krogmeier v. Barnhart</u>, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in

death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); <u>Pate-Fires</u>, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual qualifies for disability. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); <u>see also</u> <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140-42 (1987) (describing the five-step process); <u>Pate-Fires</u>, 564 F.3d at 942.

Steps One through Three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. <u>Pate-Fires</u>, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. <u>Id.</u> Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform past relevant work. <u>Id.</u> The claimant bears the burden of demonstrating he is no longer able to return to his past relevant work. <u>Id.</u> If the Commissioner determines the claimant cannot return to past relevant work, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work. <u>Id.</u>

In this case, the Commissioner determined that Hunt could not perform his past work, but that he retained the RFC to perform the full range of light work.

## V. DISCUSSION

Hunt argues the ALJ's decision is not supported by substantial evidence. First, he argues that the ALJ failed to properly consider the opinion evidence. In particular, he argues that the ALJ erred by rejecting the opinions of Christopher Hartigan, a treating source, and erred by giving controlling weight to the opinion of Dr. Runde, a non-treating physician. Second, he argues that the ALJ erred by failing to obtain evidence from a vocational expert. Because he had the non-exertional impairment of chronic pain, the ALJ erred by relying on the vocational guidelines.

**Weighing Medical Testimony**

The ALJ has the role of resolving conflicts among the opinions of various treating and examining physicians. <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1219 (8th Cir. 2001). The ALJ may reject the conclusions of any medical expert, whether hired by the government or the claimant, if they are inconsistent with the record as a whole. <u>Id.</u> Normally, the opinion of the treating physician is entitled to substantial weight. <u>Casey v. Astrue</u>, 503 F.3d 687, 691 (8th Cir. 2007). The opinion of a consulting physician, who examines a claimant once, or not at all, generally receives very little weight. <u>Singh v. Apfel</u>, 222 F.3d 448, 452 (8th Cir. 2000).

Still, the opinion of the treating physician is not conclusive in determining disability status, and must be supported by medically acceptable clinical or diagnostic data. <u>Casey</u>, 503 F.3d at 691. The ALJ may credit other medical evaluations over the opinion of a treating physician if the other assessments are supported by better or more thorough medical evidence, or when the treating physician's opinions are internally inconsistent. <u>Guilliams v. Barnhart</u>, 393 F.3d 798, 803 (8th Cir. 2005); <u>Cantrell v. Apfel</u>, 231 F.3d 1104, 1107 (8th Cir. 2000). In determining how much weight to give a treating physician's opinion, the ALJ must consider the length of the treatment relationship and the frequency of examinations. <u>Casey</u>, 503 F.3d at 692.

In this case, the ALJ discounted the opinion by Nurse Christopher Hartigan as inconsistent with his previous medical notes, and inconsistent with the medical evidence as a whole. Substantial evidence supports this decision.

In reaching this decision, the ALJ properly noted that Nurse Practitioner Hartigan was not a treating physician whose opinions could establish a medically determinable impairment. Under the regulations, evidence from acceptable medical sources is necessary to prove a claimant suffers from a medically determinable impairment. <u>Crowder v. Astrue</u>, No. 4:08 CV 1603 FRB, 2010 WL 559131, at *7 (E.D. Mo. Feb. 10, 2010) (citing 20 C.F.R. § 416.913(a)). Acceptable medical sources include licensed physicians, licensed or certified psychologists, and licensed or certified individuals performing the functions of a school psychologist in a school setting. <u>Id.</u> Information from "other sources"

such as nurse practitioners and physicians' assistants, may be used to show the severity of an impairment or how the impairment affects a claimant's ability to work, but it cannot be used to establish the existence of a medically determinable impairment.  Id.  The ALJ recognized, and properly applied, this standard.

More to the point, Hartigan's conclusions were inconsistent with his own findings and with the medical evidence in the record.  In a summary report on January 14, 2009, Hartigan concluded that Hunt had poor or no ability to deal with the public, interact with a supervisor, deal with work stress, and understand, remember, and carry out complex job instructions. (Tr. 284-85.) Yet, that same day, Hartigan had found Hunt had a normal affect, was not agitated or anxious, and had no suicidal ideation.  (Tr. 283.)  Indeed, the medical notes from that examination do not indicate Hunt suffered from any mental or psychiatric impairments. (See id.)

Evidence from the record also indicates that Hunt's mental impairments were not as severe as noted in the January 2009 report.  Hunt's girlfriend noted that he had trouble getting along with others, but stated he had no problem paying attention or following instructions. (Tr. 180-81.)  He was also able to vacuum, sweep, make himself sandwiches, do laundry, and drive a car. (Tr. 177-78, 184.)  During a mental examination, Dr. Runde found Hunt was alert and oriented, in no acute distress, and that he had a full and appropriate affect.  (Tr. 213.)  During the hearing, the ALJ asked Hunt why he felt he was unable to continuing working.  Hunt described his physical impairments, but did not list any mental impairments.  (Tr. 28-29.)  Finally, there is no evidence in the record that Hunt received regular treatment from a psychiatrist, or that he ever required any psychiatric hospitalizations. See Rose v. Apfel, 181 F.3d 943, 945 (8th Cir. 1999) (finding claimant was not disabled because, among other reasons, she had not had any episodes of decompensation).  Under the circumstances, the ALJ properly discounted the opinions of Nurse Hartigan.

The ALJ cited, with approval, the medical report from Dr. Runde. In his report, Dr. Runde found Hunt was able to dress and undress without help, that his spine showed normal range of motion, and that his

lower extremities were normal. Dr. Runde also found Hunt's subjective opinions were greater than the objective findings. (Tr. 213-15.) These findings are consistent with the medical record. In May 2007, Dr. Wright found only mild spondylolysis, and noted that the vertebral heights and alignment were maintained. (Tr. 228.) In January 2008, Dr. Bauman found Hunt had disk dessication and mild subluxation, but no significant canal stenosis, foraminal narrowing, or nerve root compression. (Tr. 225-26.) In April 2008, Dr. Igbaseimokumo found Hunt's cranial nerves were intact, his reflexes were symmetrical, and that he had normal power in his extremities. Dr. Igbaseimokumo recommended conservative treatment. (Tr. 230-31); see Craig v. Chater, 943 F.Supp. 1184, 1189 (W.D. Mo. 1996) ("Allegations of a disabling impairment may be properly discounted because of inconsistencies such as minimal or conservative medical treatment."). Because Dr. Runde's findings are consistent with the medical record, the ALJ properly considered his opinion.


**Vocational Expert**

When the ALJ determines that a claimant cannot perform past relevant work, the burden shifts to the Commissioner to prove there is work in the national economy that the claimant can perform. Ellis v. Barnhart, 392 F.3d 988, 993 (8th Cir. 2005); 20 C.F.R. § 404.1560(c). If the ALJ finds the claimant has only exertional impairments, the Commissioner may meet this burden by referring to the Medical-Vocational Guidelines (known as the "Grids"). Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992). If the ALJ finds the claimant suffers from a non-exertional impairment, the Commissioner may still meet this burden by consulting the Guidelines, but only in certain circumstances. See Thompson v. Astrue, 226 F. App'x 617, 621 (8th Cir. 2007) (unpublished per curiam); Sanders v. Sullivan, 983 F.2d 822, 823 (8th Cir. 1992). "An ALJ may use the Guidelines even though there is a nonexertional impairment if the ALJ finds, and the record supports the finding, that the nonexertional impairment does not diminish the claimant's residual functional capacity to perform the full range of

activities listed in the Guidelines." Lucy v. Chater, 113 F.3d 905, 908 (8th Cir. 1997); see also Lowry v. Astrue, No. 2:09 CV 29 MLM, 2010 WL 1221780, at *10 (E.D. Mo. Mar. 30, 2010) ("Resort to the Medical-Vocational Guidelines is only appropriate when there are no nonexertional impairments that substantially limit the ability of [the claimant] to perform substantially gainful activity.").

On the other hand, if the ALJ finds the claimant has non-exertional impairments, and these impairments diminish the claimant's capacity to perform the full range of jobs listed in the Medical-Vocational Guidelines, the Commissioner must solicit testimony from a vocational expert to show the claimant has the capacity to perform work in the national economy. Robinson, 956 F.2d at 841. A non-exertional impairment is any limitation, besides strength, which reduces an individual's ability to work. Sanders, 983 F.2d at 823. Pain and mental impairments are two such limitations. See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

In this case, the ALJ concluded that Hunt had the RFC to perform the full range of light work. In reaching this decision, the ALJ relied on the medical-vocational guidelines, and noted the difference between exertional and nonexertional limitations. (Tr. 18.) The ALJ also noted that the medical record did not indicate that Hunt had any significant side effects from medication, that he needed to repeatedly lie down during the day, or that he suffered from severe depression. (Tr. 12, 17.) Substantial evidence supports the ALJ's conclusions.

The medical record indicates that Hunt's nonexertional limitations did not significantly affect his RFC. In November 2006, Hunt's girlfriend noted that he was able to feed and change her two-year old child. (Tr. 175-76.) She also stated he was able to make himself sandwiches, load the dishwasher, drive, and go out by himself. (Tr. 177-78). In December 2006, Dr. Runde found Hunt was able to dress and undress without help, and could get on and off the table without help. Dr. Runde also found Hunt had full range of motion in his spine, a normal gait, and normal muscle strength in his hands -- even though his results suggested poor effort. Finally, Dr. Runde noted that Hunt's

subjective opinions were greater than the objective findings. (Tr. 213-15.)

In May 2007, Dr. Wright found only mild spondylolysis, and noted that the vertebral heights and alignment were maintained. (Tr. 228.) In January 2008, Dr. Bauman found Hunt had disk dessication and mild subluxation, but no significant canal stenosis, foraminal narrowing, or nerve root compression. (Tr. 225-26.) In April 2008, Dr. Igbaseimokumo found Hunt's cranial nerves were intact, his reflexes were symmetrical, and that he had normal power in his extremities. Dr. Igbaseimokumo recommended conservative treatment. (Tr. 230-31.) As noted by the ALJ, none of Hunt's doctors ever advised him to lie down, or noted any side effects from his medications.

The medical record also indicates that Hunt's mental impairments did not significantly affect his RFC. In January 2009, Hartigan had found Hunt had a normal affect, was not agitated or anxious, and had no suicidal ideation. (Tr. 283.) The medical notes from that examination do not indicate Hunt suffered from any mental or psychiatric impairments. (See id.) Dr. Runde found Hunt was alert and oriented, in no acute distress, and that he had a full and appropriate affect. (Tr. 213.) During the hearing, the ALJ asked Hunt why he felt he was unable to continuing working. Hunt described his physical impairments, but did not list any mental impairments. (Tr. 28-29.) Finally, there is no evidence in the record that Hunt received regular treatment from a psychiatrist, or that he ever required any psychiatric hospitalizations.

Looking to the medical evidence, substantial evidence supports the ALJ's determination that Hunt's nonexertional limitations did not significantly limit his ability to perform the full range of light work. As a result, the ALJ properly relied on the medical-vocational guidelines in concluding that Hunt was not disabled. See Lucy, 113 F.3d at 908; see also Kriebaum v. Astrue, 280 F. App'x 555, 559 (8th Cir. 2008) (unpublished) (finding that the use of the guidelines was proper, because the medical record "failed to show any significant effect of pain on [the claimant's] functional abilities."). The ALJ did not err by failing to call a vocational expert. See Thompson v. Bowen, 850 F.2d 346, 349 (8th Cir. 1988) ("[I]f the ALJ determines that a claimant's

nonexertional limitations do not affect the claimant's [RFC] then the ALJ may rely on the Guidelines to direct a conclusion of either disabled or not disabled without resorting to vocational expert testimony.").

## VI. CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed. An appropriate Judgment Order is issued herewith.


    __/S/   David D. Noce__
    **UNITED STATES MAGISTRATE JUDGE**


Signed on June 1, 2010.